UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW JERSEY
TRENTON VICINAGE

————————————————— X
West Trenton Hardware LLC,            :

                    Plaintiff,     :
                                                        ACTION NO. 21-CV-17662
                                     :

                 against              :

                                     :                  **AMENDED COMPLAINT**
                                     :

Brooklyn Textiles, LLC,             :                  JURY TRIAL DEMANDED

                      Defendant.     :

————————————————— X

      West Trenton Hardware LLC, by and through its attorneys, Lanciano & Associates, LLC, for its Complaint against Brooklyn Textiles, LLC, alleges, on knowledge as to its own actions, and otherwise upon information and belief, as follows:

## PRELIMINARY STATEMENT

      1. This is a straightforward matter seeking recovery from Defendant for its failure to deliver goods that conformed to Plaintiff's purchase orders. Specifically, Plaintiff ordered from Defendant approximately twenty million nitrile gloves. Of the gloves Defendant delivered, approximately one-fifth were, in fact, not nitrile. Plaintiff has demanded Defendant replace the defective goods or refund the purchase price thereof, to no avail.

      2. Plaintiff seeks an order requiring Defendant to refund the approximately one million dollars paid by Plaintiff for said defective goods, or pay the approximately

four hundred fifty-six thousand dollars paid by Plaintiff for replacement goods, and reimburse Plaintiff for costs incurred for inspection, receipt, transportation, and care and custody of the defective goods.

## JURISDICTION

3. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), in that this is a civil action between citizens of New Jersey and New York, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

## VENUE

4. Venue is proper in this district under 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to the claim occurred in this district.

## PARTIES

5. West Trenton Hardware LLC is a limited liability company formed under the laws of New Jersey and does business in West Trenton, New Jersey. West Trenton Hardware LLC has two (2) members: Thomas Nemec and Robert Nemec, each of whom is a citizen and resident of New Jersey. West Trenton Hardware LLC owns and operates a business known as West Trenton True Value Hardware, a hardware store which offers its customers equipment and tool rentals, as well as a variety of retail items. West Trenton Hardware LLC is the entity that ordered from Defendant approximately twenty million medical grade nitrile examination gloves.

6. Upon information and belief, Brooklyn Textiles, LLC is a limited liability company formed under the laws of New York and does business in Brooklyn, New

York. Upon information and belief, Brooklyn Textiles, LLC has one (1) member: George Popescu, who is a citizen of New York. Brooklyn Textiles, LLC accepted Plaintiff's order and purported to deliver approximately twenty million nitrile gloves.

## FACTS

### I. Plaintiff and Defendant Establish a Course of Dealing

7. From October 2020 to April 2021, Plaintiff ordered more than five million dollars of goods from Defendant. The course of dealing between the parties was such that Plaintiff would email Defendant orders, and Defendant would accept those orders by fulfilling them.

### II. Plaintiff Orders Approximately 20,000,000 Nitrile Gloves

8. Plaintiff purchased approximately 20,000,000 medical-grade, nitrile examination gloves from Defendant during the period February through April 2021. Plaintiff purchased said gloves from Defendant for the purpose of filling an order from the State of New Jersey.

9. Throughout the aforementioned period, Defendant came into New Jersey on twenty-two separate occasions and delivered gloves purporting to meet Plaintiff's specifications. Attached hereto as Exhibit A are true and correct copies of the evidence of Defendant's delivery of Plaintiff's order.

10. At Plaintiff's request, each of the twenty-two deliveries was delivered directly to warehouse space leased by the State of New Jersey in South Plainfield, New Jersey by Defendant using, upon information and belief, its own trucks.

11. Upon information and belief, New Jersey's South Plainfield warehouse space acted as an aggregating center for the distribution of personal protective equipment ("PPE") during the pandemic.

12. Upon information and belief, when Defendant delivered a shipment of gloves to New Jersey's South Plainfield warehouse, the employees receiving the delivery would record, among other information, a pallet code, a pallet location, a lot number, and a serial number.

13. Upon information and belief, New Jersey would then distribute the gloves from the South Plainfield warehouse in accordance with resource requests submitted by agencies and localities throughout the state.

14. Upon information and belief, when New Jersey would distribute gloves and other PPE from the South Plainfield warehouse, it would record, among other information, the pallet code, pallet location, lot number, and serial number of the PPE that was being distributed.

15. Each of the boxes containing the gloves delivered by Defendant was labeled as containing nitrile examination gloves.

16. Defendant fully fulfilled Plaintiff's order on April 15, 2021, and Plaintiff paid Defendant in full.

### III.     Plaintiff Discovers Defendant's Gloves Were Not Nitrile

17. A mere five days after Defendant's final delivery, Plaintiff learned that many of Defendant's gloves were not nitrile, and, therefore, were non-conforming in a material respect.

18. New Jersey notified Plaintiff that certain of the gloves Defendant delivered were non-conforming because they were made of latex instead of nitrile.

19. New Jersey came to that initial conclusion because while using the gloves, a number of first-responders or the patients the first-responders were examining who had latex allergies suffered reactions consistent with latex exposure.

20. Thus, the State of New Jersey had samples from the gloves delivered by Defendant tested by an independent laboratory.

21. Those tests revealed the presence of latex. Attached hereto as Exhibit B is a true and correct copy of the laboratory results provided to Plaintiff by the State of New Jersey.

### IV. Plaintiff Gives Defendant Seasonable Notice of the Non-Conformity

22. Within five days of learning of the non-conformity, Plaintiff gave Defendant notice of said non-conformity and demanded that it resolve said non-conformity.

23. In response, Defendant's principal stated that the gloves were "bought in NJ from a local distributor" and that "it was of course certified and inspected as 100% nitrile." He further stated that he was "very surprised" about the non-conforming goods.

24. Despite its professed ignorance of the non-conformity, Defendant did nothing to correct the non-conformity after receiving seasonable notice of it from Plaintiff.

25. Plaintiff's seasonable notice of the non-conformity operated as a rejection of said non-conforming goods.

5

26. After conducting a spot-check of Defendant's gloves, Plaintiff learned that there were approximately $1 million dollars' worth of non-conforming goods.

27. Upon information and belief, Defendant relied on the representations of its supplier that the gloves it procured were, in fact, nitrile gloves.

28. Such reliance, however, was unreasonable because it was well-reported long before Plaintiff placed its order that manufacturers were misrepresenting latex and vinyl gloves as, "examination grade," i.e., nitrile. See Susan Pulliam et al., *Brokers Peddle Fake Medical Gloves Amid Coronavirus Shortages*, Wall St. J., Sept. 15, 2020, at A2.

29. In total, the State of New Jersey has determined that 5,796,000 of the gloves supplied by Defendant were misrepresented as medical grade nitrile gloves.

30. The defective products in question are as follows:

    a. MedCare: 170,000 gloves;

    b. SH Gloves: 587,000 gloves;

    c. Sky Med: 2,858,000 gloves; and

    d. Asmsvlnawa (Sri Trang Gloves) 2,181,000 gloves.

31. Plaintiff reasonably relied on Defendant's representation that it complied with the specification that it deliver nitrile gloves.

32. Furthermore, each box in the non-conforming lots purported to be nitrile gloves, so a visual inspection of the gloves would not obviously reveal the defect.

6

33. As a result of Defendant's breach, Plaintiff purchased replacement goods in the amount of $456,435, and it now has in its possession nearly all of the non-conforming gloves.

## COUNT I: BREACH OF CONTRACT

34. Plaintiff repeats and realleges paragraphs 1 through 33 hereof, as if fully set forth herein.

35. The gloves supplied by Defendant constitute "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), N.J.S.A. § 12A:2-101 et seq.

36. The purchase orders issued by Plaintiff constituted an offer to enter into a contract for the provision of approximately twenty million medical grade nitrile examination gloves.

37. By accepting said purchase orders, Defendant formed a contract with Plaintiff containing the material term that Defendant deliver approximately twenty million medical grade nitrile examination gloves.

38. Defendant breached the contract by delivering gloves that were not made of nitrile, but were instead made of latex.

39. Upon learning of Defendant's breach, Plaintiff notified Defendant of said breach and demanded that Defendant remedy the breach.

40. By reason of the foregoing, Plaintiff is entitled to damages pursuant to N.J.S.A. § 12A:2-714, which permits a plaintiff to recover as damages for any non-conformity in *accepted* goods an amount determined in any manner that is reasonable.

41. Plaintiff suffered damages in the amount of $456,435 by having to purchase replacement gloves on the open market to replace the accepted, non-conforming goods.

## COUNT II: ACTION TO REVOKE ACCEPTANCE

42. Plaintiff repeats and realleges paragraphs 1 through 41 hereof, as if fully set forth herein.

43. Plaintiff accepted the non-conforming goods without actual knowledge of the non-conformity.

44. The non-conformity was difficult to discover because each of the boxes containing the non-conforming goods is labeled as containing nitrile gloves when, in fact, each box contains latex gloves.

45. The non-conformity was likely to be discovered either when a person with a latex allergy came into contact with the non-conforming gloves or when a person wearing such non-conforming gloves sustained a burn, puncture wound or contamination that conforming, nitrile gloves would have prevented, because of the deceptive nature of the packaging and the fact that nothing obviously distinguishes latex from nitrile gloves.

46. The non-conformity was, in fact, only discovered when people with a latex allergy came into contact with the non-conforming gloves.

47. Within a reasonable time of discovering the non-conformity, Plaintiff notified Defendant of the non-conformity, which was subsequently confirmed by testing.

8

48. As such, the Plaintiff invokes its right pursuant to N.J.S.A. § 12A:2-608 to revoke its acceptance of the non-conforming goods that are currently in its possession.

49. A revocation of acceptance constitutes a rejection of goods, which entitles the party revoking acceptance to the remedies prescribed by N.J.S.A. § 12A:2-711.

50. Pursuant to N.J.S.A. § 12A:2-711, Plaintiff is entitled to recover the amount of the purchase price it paid for the rejected goods together with costs of inspection, receipt, transportation, and care and custody of said goods.

### COUNT III: BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

51. Plaintiff repeats and realleges paragraphs 1 through 50 hereof, as if fully set forth herein.

52. Pursuant to the UCC, every agreement for the sale of goods contains implied warranties from the seller of merchantability and fitness for a particular purpose, and warranties that are customary and common in the particular industry.

53. Nitrile gloves are made of a synthetic material known as acrylonitrile butadiene rubber, and have no latex protein content. They are ideal for use in healthcare fields because they protect against exposure to bodily fluids, viruses, and blood borne pathogens. Unlike latex gloves, which are more elastic and provide greater tactile sensitivity, nitrile gloves have superior strength and durability, which make them significantly more resistant to punctures, chemicals, and extreme temperatures, and because their composition does not include latex protein or

Case 3:21-cv-17662-ZNQ-JBD Document 30-2 Filed 04/25/23 Page 9 of 13 PageID: 536

natural rubber compounds, they lack the risk of the allergic reactions presented by latex gloves.

54. The few but stark differences between latex gloves and nitrile gloves demonstrate that the ordinary purpose for which the latter is intended is to provide greater protection against certain risks which either require the use of gloves generally, such as punctures or exposure to caustic or toxic chemicals, or can result from the use of gloves, such as allergic reactions.

55. Plaintiff did not merely order "gloves" or "examination gloves" without reference to glove type. Plaintiff specifically ordered medical grade nitrile examination gloves, precisely because of their ordinary and known purpose of providing superior protection against contamination, burns, and allergic reactions.

56. Consequently, Defendant's delivery of gloves which were comprised of latex were not reasonably fit for the general purpose for which nitrile gloves are manufactured and sold – to provide users with a stronger and more durable glove that will give them a level of protection against exposure and contamination not experienced with latex and other gloves, and without the risk of the allergic reactions common to latex glove use.

57. Defendant failed to provide Plaintiff with any notice or proper instructions regarding the non-conforming latex gloves that it delivered in place of the nitrile gloves ordered by Plaintiff.

58. Now that Plaintiff has regained possession of the non-conforming goods from the State of New Jersey, it cannot resell them because to do so would be a violation of N.J.S.A. § 2C:21-7, which criminalizes the sale of mislabeled commodities.

59. Therefore, Defendant's failure to furnish nitrile gloves breached the implied warranty of merchantability contained in the agreement.

### COUNT IV: BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE

60. Plaintiff repeats and realleges paragraphs 1 through 59 hereof, as if fully set forth herein.

61. In addition to the ordinary, general purpose of nitrile gloves being to provide greater protection against contamination from punctures, burns, and allergic reactions, it was the particular purpose for which Plaintiff ordered such gloves from Defendant, in order to fill an order from the State of New Jersey, which required said gloves.

62. Defendant was aware of the different qualities and characteristics distinguishing nitrile gloves from latex gloves, and therefore had reason to know of Plaintiff's particular purpose in ordering nitrile gloves.

63. Defendant knew that the nitrile gloves ordered by Plaintiff were to be delivered directly to the warehouse of Plaintiff's customer, the State of New Jersey, and therefore knew that Plaintiff did not have the ability to determine prior to shipping or delivery whether the gloves were conforming. Accordingly, Defendant had reason to know that Plaintiff was relying upon its skill or judgment to select and furnish conforming, nitrile gloves.

64. Non-conformity of the ordered gloves could only be determined after testing because each of the boxes containing the non-conforming gloves was labeled as containing nitrile gloves, and since Plaintiff was unable to inspect the gloves supplied by Defendant prior to their delivery, Plaintiff did, in fact, rely upon Defendant's skill or judgment in selecting and furnishing conforming gloves.

65. Defendant's failure to furnish nitrile gloves breached the implied warranty of fitness for a particular purpose.

## DEMAND FOR JURY TRIAL

66. Pursuant to Federal Rule of Civil Procedure 38(b), West Trenton Hardware, LLC requests a trial by jury on all issues properly triable to a jury.

## PRAYER FOR RELIEF

**WHEREFORE**, West Trenton Hardware, LLC requests judgment as follows:

A.  On Counts I, II, III and IV, awarding damages in favor of West Trenton Hardware LLC, in an amount to be determined at trial.

B.  Granting West Trenton Hardware LLC such other and further relief as the Court deems just and proper.

Dated: January 24, 2022

> By: /s Larry E. Hardcastle, II, Esq.
> Larry E. Hardcastle, II, Esq.
> Bar Number: 025742010
> lhardcastle@lancianolaw.com
> Lanciano & Associates, LLC
> 2 Route 31 North
> Pennington, NJ 08534
> (609) 452-7100
> Attorneys for Plaintiff West Trenton
> Hardware LLC

12

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

I hereby certify pursuant to Local Civil Rule 11.2 that this matter in controversy is not the subject of any other action pending in any court, arbitration or administrative proceeding.

Dated: January 24, 2022

/s Larry E. Hardcastle, II, Esq.
Larry E. Hardcastle, II, Esq.
Lanciano & Associates, LLC
2 Route 31 North
Pennington, NJ 08534
(609) 452-7100

## LOCAL RULE 201.1 CERTIFICATION

I hereby certify that the matter in controversy is not eligible for compulsory arbitration because Plaintiff seeks damages exceeding $150,000

Dated: January 24, 2022

/s Larry E. Hardcastle, II, Esq.
Larry E. Hardcastle, II, Esq.
Lanciano & Associates, LLC
2 Route 31 North
Pennington, NJ 08534
(609) 452-7100